Okay, from the world of criminal law to the world of cheerleading, there may not be much of a difference. Case number 24-12653, U.S. All Star Federation, Inc. v. Open Cheer & Dance Championship Series at all. I'd like to think there's a difference between the cases. Take your time setting up and we'll hear from Ms. Riccio first. Good morning. My name is Nicole Riccio. I represent the appellant, U.S. All Star Federation, also known as USASF. We think this matter should be reversed for two reasons. Number one, there are issues of fact which pervade every substantive issue before the court on summary judgment. A reasonable jury could find from this record that USASF's marks world and the cheerleading world are inherently distinctive or at a minimum have acquired distinctiveness. And number two, on the affirmative defenses, the defendants dismiss these defenses of genericness, descriptiveness, and lack of secondary meaning with prejudice. And that has meaning. It means that they were resolved on the merits and the district court should not have permitted these defenses to be resurrected on summary judgment. When you talk about the marks, if you could distinguish between the two marks. I mean, my perspective coming in without having heard arguments is that you probably have a stronger argument for reversal with regards to cheerleading worlds, but you may not have as strong an argument as to worlds. I think that's fair. I think it's important to distinguish between the two marks, and I think that wasn't necessarily done at the district court level. When we're talking about the two marks and the issue of distinctiveness, this is a question of fact. On both marks, all of the evidence needs to be looked at in the light most favorable to USASF. All reasonable inferences need to be drawn in USASF's favor. And so we start with suggestiveness and ask, are each of the marks suggestive? Under the engineer and tax services court case, if a reasonable jury could find that they're suggestive, the analysis stops. You don't need to consider secondary meaning as well. So with respect to suggestiveness, there's testimony from USASF that the marks worlds and the cheerleading worlds were both selected because they were unique and distinctive, and no one else was using these marks in cheerleading. There is also, there are multiple emails from the defendants themselves acknowledging the uniqueness of worlds. Of course, if worlds is distinctive inherently, then the cheerleading worlds is also going to be inherently distinctive. I'm not sure that, I mean, you think cheerleading worlds is fanciful or arbitrary? We're not arguing that they're fanciful or arbitrary. We're saying, we're arguing that they are inherently distinctive, that they're suggestive, both marks. And then at a minimum, based on the record, that a reasonable jury could find that, or if not, that they are descriptive and have acquired secondary meaning. And if you created a fact question, a sufficient fact question, simply on whether they were descriptive and had acquired secondary meaning, then the district court would have erred, and this case would have to go back for a trial. That's your view? Yes, that's right. So why don't you tell me why they were descriptive? I'm talking now only about the cheerleading world, not the worlds. Why in your view the evidence is sufficient to establish that if believed, the jury could find, A, that the mark was descriptive, and B, that it had acquired secondary meaning, rendering it distinctive? Sure. So here we're talking about the distinction between genericness and descriptiveness. Genericness means it refers to a class of goods or services, and there is no evidence in the record that any consumer in the cheerleading industry uses worlds or the cheerleading worlds to refer to a class of competitions. It is universally in this record used to refer as a source identifier for USASF's event. So there's this over-reliance on these dictionary definitions, none of which actually define worlds or worlds to mean a cheerleading world championship competition. There's a debate about whether they're even in the record at all. They're paraphrased at the bottom and linked at the bottom of defendant's summary judgment brief. So there's certainly no evidence that they refer to a class of cheerleading competitions. So then you're in, well, are they descriptive and have they achieved secondary meaning? There are multiple factors that go to secondary meaning, the nature and extent, the length of use of the marks. USASF has been using both marks since 2004, since the first worlds competition was held at ESPN, Wide World of Sports at Disney. The nature and extent of the advertising and promotional efforts, again, there's substantial evidence in the record going all the way back. We have specific data from Flow Sports in the record regarding the streaming services promoted under the worlds and the cheerleading worlds trademarked, millions of impressions on social media and on their website. You also have some media sources where individuals not associated with either of the parties refer to cheerleading worlds as this competition. Yes, there's multiple examples of unsolicited media in the record as well. And then I think it's also very persuasive that the USPTO, considering USASF's 2021 application for the cheerleading worlds, accepted the evidence of acquired distinctiveness. That full set of evidence that the USPTO examiner had in front of it is in the record before this court as well. There's a big debate in the trademark world about whether that's entitled to anything. Because you're not supposed to get a presumption from the secondary register. On the other hand, it means something. Right. So there's two applications. There was the 2004 application for the cheerleading worlds and that went on the supplemental register. And even in that instance, the examiner did not require a disclaimer of the word worlds because even that portion of the mark was capable of achieving secondary meaning. There's also the 2021 application, which was approved for publication on the principal register. And the only reason it hasn't registered is because there's a pending opposition and that application is suspended. But again, the trademark examiner found the record in front of it was adequate to find that the cheerleading worlds had acquired distinctiveness and again, didn't require a disclaimer of worlds, meaning that that portion as well had acquired distinctiveness. And from that, I think it's hard to say a reasonable jury could not find the same as the trademark examiner who reviews hundreds or thousands of these applications and is an expert on trademark law. Help me with the other mark, worlds alone. It seems to me that's the tougher of the arguments to make here. Sure. I think that is the tougher of the arguments. I think even as to worlds alone, there is not evidence in the record that that refers to a class of cheerleading competitions, which is the standard for genericness. There's the only thing that they can point to are these dictionary definitions. Again, not really in the record. Don't, if you read the definitions, don't actually define worlds plural and don't define worlds singular to refer to, to mean a cheerleading world championship. You also have a lot less evidence, factual, hard evidence with regard to worlds than you do with regards to cheerleading worlds, right? People don't, not everybody who uses cheerleading worlds also uses worlds. There is an overlap between the two universes, but it's not one to one. I think the evidence on secondary meaning is largely applicable to both. I think if you look at, there's a handful of emails, for example, from defendants where they, at document 166-47, the term worlds could technically be protected by trademark. Document 173-8, if USASF has any problems, it could only be with the name. Document 212-4, worried about possible trademark issues with the word worlds as it is unique. I think if defendants perceive that worlds is unique and distinctive, I think it's reasonable to infer that the rest of the industry does as well. I think there's, there are a handful of videos that were conventionally filed. Isn't worlds really generic by nature? It refers to the overall genus of global competition. I don't think. Isn't that kind of generic? I don't think there's any evidence in the record that supports that. I think the evidence in the record, and there's actually testimony from defendants own corporate representative, Jeb Harris, where he says he's not aware of any other all-star cheerleading competition that calls itself worlds in the name of the competition. You're saying that makes it distinctive? I think it makes it distinctive. I think at a minimum, it makes it a source identifier for USASF's event, and it is not, I just don't think there's support in the record that it refers to a large. Right, but the word itself, worlds, is sort of an untethered geographic term. Doesn't really say anything more than that, does it? I mean, it's a reference to a point of geography. I think the word world is a reference to a point of geography. So you think by making it plural, it has lost its generic character? I think it makes a difference. Tell me why. So when you're considering the distinctiveness of a mark, you're looking at how do consumers usually view it, and is there some sort of incongruity with how they perceive it. I don't think consumers perceive worlds the same way as world, as you say. The term might be a reference to not one world, but multiple worlds. H.G. Wells wrote a book a long, long time ago, it was called The War of the Worlds. We had aliens that came in from some foreign planet, et cetera, but the notion was if you made the word world plural, you were just referring to more than one. How does that acquire some kind of distinctive character, let alone establish secondary meaning? I think that's a great example, because if you view worlds as meaning multiple worlds, well, that's not descriptive at all of USASF's event. I think that shows that there could be some sort of double entendre. I think it's similar to, for example, arm versus arms. You add an S, it can mean something very different. You could be talking about firearms. Do you think when the word worlds was used, they meant it as a double entendre? Do you think that's what's going on here? I think that consumers need to make a imaginative leap to associate worlds with a cheerleading competition. I think that establishes it's suggestive. But I think at a minimum, I think there is some maybe confusion, or at least there was at the district court, between generic and descriptive. I mean, American Airlines is considered to be a descriptive mark that has acquired secondary meaning. The Vision Center case that is cited, too, in the briefs is Vision Center was descriptive. It was not generic. And I think that's an important distinction. Thank you very much. Thank you. Yes, thank you, Your Honors. Good morning, and may it please the court. I'm here on behalf of the defendants in the case, the appellees. And I think it's important. It's helped me a lot in reviewing the record to narrow down the evidence that is actually relevant and applicable to that very first step that a plaintiff has to make, which is showing it has a valid and protectable trademark. And so on that first step, before you ever get into a likelihood of confusion analysis, you have to look at the relevant date in which you consider the evidence, which is, whenever you're looking at the distinctiveness of the mark, it's at the time the alleged infringement began. And here in the briefing, the plaintiff has confirmed it alleges the infringement began no later than July of 2020. So up to that point, then, they would have to present evidence showing that their marks had acquired distinctiveness as of that date. And when you view the evidence with that lens, that cuts out probably, and I'm not a mathematician, but I think it cuts out probably 90 percent of the plaintiff's exhibit. But that assumes that evidence that postdates that fixed date is irrelevant to the question of whether or not it had acquired any trademark rights before then. That's not necessarily so. I mean, if you have, let's say that they peg the date of infringement as January 1st of 2020, right? And there is a news report from a television station in Atlanta on January 2nd that refers to cheerleading worlds and identifies USAF with them and all. You're saying that would be legally irrelevant to the question of whether or not two days earlier it acquired secondary meaning? I don't think you can cleave the evidence that neatly. Well, I would think under the Eleventh Circuit, where it talks about with distinctiveness or secondary meaning, that if it is an article or it is usage, whether it be in the media or by an individual after the date of the alleged infringement beginning, I do think we would take the position that that is not relevant to that question. Now, that would be a much closer call. I would agree that that would be a much more difficult decision to make. But here, I don't think we have very many instances of that. This is mostly things from 2022, 2021, perhaps a little from 2023. I don't believe there's many that would be in such a close call. And one thing to think on that is this is a bit of a seasonal event, this Cheerleading World Championship. It happens in April of each year, typically April or May. And so you're probably, when you're looking at that usage, it would probably be, you know, alleged infringement began with the announcement, they say, in July of 2020. And so you're probably not looking at anything really, again, in public usage until the next season, the next year, if that makes sense, being a seasonal sport. And so if we were to view that, though, with the evidence being, if you have a media article from 2022 or 2023, nothing relevant, we're left with just a few categories of evidence that would be predating the alleged infringement. The district court didn't go off on that first ground you mentioned, right? Oh, sorry. I apologize, Your Honor. The district court did not slice and dice the plaintiff's evidence the way you suggested should be. No, I don't believe she did. I think the district court, I know the other side has argued that it improperly weighed evidence or didn't consider contradicting evidence. But regardless of what it did, I mean, it considered all of the evidence submitted by the plaintiff. That was how I viewed it. Right. It considered all the evidence. Right. But it didn't do that bifurcation that you mentioned between post-infringement evidence and pre-infringement evidence, alleged infringement. How I read the opinion is that it did not make that distinction and actually weighed everything in favor of the plaintiff and gave it all the benefit of the doubt there. Is there a difference, do you think, between cheerleading worlds and worlds, or do they all fall and rise to the same degree? I don't think they necessarily fall and rise to the same degree because worlds, it's not entitled to, of course the Supplement Register doesn't give you any substantive rights in a lawsuit, but it does limit you to a certain geographical area. You have to show that you were using the mark within an area and you're entitled to protection only within that geographical area that you've used. Whereas if you do have a mark on the Supplement Register, it gives you standing to sue more broadly. So the Supplement Register, hopefully that makes sense. It doesn't give you, it's not substantive evidence of anything, but it provides you standing as opposed to just having a common law mark. And so for here, for example, we talked about some of the media articles, and I believe there's three that would predate the alleged infringement. And so for those articles, they would actually need to show that they, for worlds at least, that there were articles that would have impacted a consumer's perception within Florida where that common law mark was being used. I think the one that they cite to probably the most, I think, was from, it appears to be a printout from an online article from Paso Robles. I might be mispronouncing that. When I searched that town, it's a town of about 30,000 people out in California. And in that article, then for worlds, it'd be our position that's not evidence that would support a common law trademark because they haven't proven that they actually were using the mark out there in California. It's being used locally in Orlando. And also in that article itself, and it's our position that actually hurts any claim of non-genericness or secondary meaning because in the title of that article, it uses world and worlds lowercase throughout, which to us is a sign of mark being used generically. And so you think the body of evidence presented by the appellant here is the same on worlds as it is on the cheerleading worlds? I think they have- Both as to the issue of descriptiveness and as to the issue of secondary meaning? I think there would be less on worlds separate from the cheerleading worlds. I think there's less showing that that would be, it's our position that we don't think there is any evidence- The reason I ask you what you can help me with is I see a difference. Although they were sort of argued as the same thing, it struck me reading this and looking at the record that the corpus of evidence was very different going to the cheerleading worlds than going to just the worlds, or just worlds. It seemed to me that just speaking for myself, it looked like there was a fair body of evidence going to the issues we have to decide on the cheerleading worlds, but not really on the worlds. So why should I review this as sort of a corpus or a whole? The whole thing comes up or goes down together. Just didn't strike me that way. And the reason it didn't is simply because the evidence looked very different, and there's a difference in the words here that we're talking about, the cheerleading worlds is not the same thing as worlds. I think that's right, that cheerleading worlds is not necessarily the same thing as worlds, because worlds is used to refer to multiple different things. It can't, by the USASF itself, it could refer to the dance world championship. It could refer to the IASF world championship. Worlds has also been used to refer to another event that same week, the ICU world championship or ICU worlds. And so with just worlds, it's very hard to tell without added context. And I believe their own corporate rep testimony was that you don't know what worlds is referring to without a lot of extra context to know that you're exactly talking about the USASF. Even if you're talking about the events in general, you may not know whether you're referring to the IASF or the ICU or the USASF. You think cheerleading worlds is a source identifier? No, Your Honor. Because consumers do not connect the cheerleading worlds with a single source. They just understand it. How do we know that from the record, factually? Was there any survey evidence introduced by anybody, for example? The plaintiff has no survey evidence, which is the best evidence you can, well, direct testimony and then survey evidence. The defendants are the only ones that performed a survey, and that is a part of the summary judgment record. What does the survey show? It found no likelihood of, I'm sorry, we had a likelihood of confusion analysis, but we also had a secondary meaning. So it found no source identification through the survey, no secondary meaning. And there was no counter-survey done by the plaintiff. And that's, I think what stands out, especially with the cheerleading worlds and also worlds, is the fact that they claim to have had hundreds of thousands of people going to these events over the years. And yet, we do not have a single affidavit or any direct testimony from a single consumer talking about whether they identified the cheerleading worlds and the USASF as being the source of that mark. Wouldn't it have helped if the trial judge allowed the Daubert aspect to go forward in making that determination? Well, implicitly, by not granting the Daubert motion, it was implicitly denied with the judgment because it was part of the summary judgment record, and there was no objection made during the summary judgment proceedings. And so implicitly, the Daubert motion was not granted. It would have been evidence that was considered by the court. What did that expert evidence consist of? It consisted of, her name was Ms. Harper, Dr. Harper, and she has a declaration within the summary judgment evidence, and then she also attached her survey that she had performed in her report, explaining how she'd gone about the survey and then her findings. What did that survey say? Survey found, I believe it was, I don't have the exact wording in front of me, but it was basically zero percent, it was a very negligible number of zero to one percent of people who actually even identified the mark with a single source at all, regardless of whether it was the USASF or some other company. It was a very, very low number. Let me ask you a question again, factually. You say, and I think it is accurate, that they did not, I'm talking about cheerleading worlds, hold the toll worlds aside for a minute. With regard to cheerleading worlds, there was evidence you presented by way of survey regarding the question of secondary meaning and the likelihood of confusion that you presented, and they presented no survey information. If the evidence was otherwise sufficient to take it to the jury, were they somehow required as a matter of law to present a survey? No, Your Honor, I don't believe that's dispositive by itself. So it's just a point of data along the way. That being the case, tell me why, as I tick off some of what they did present, in the aggregate, that it wouldn't be sufficient to take the question of secondary meaning regarding the cheerleading worlds to a jury. One, there were competition packets of documents and advertisements of the mark by the appellants showing substantially exclusive and continuous use. Two, there were expenditure reports on the promotion of the event using the mark over the years, including specifically $150,000 on advertisements against a budget of $9 million for the full events. Three, substantial social media postings on Facebook, Twitter, Instagram, TikTok, and YouTube promoting the association of the event with the mark. Four, Flow Sports live stream agreement to broadcast USASF event using the marks. Five, Flow Sports promotional material showing ads and postings that had 11.2 million impressions and the engagement of 619,000 and video views of 3.2 million across Flow Sports social platform. Six, compendium of 572,000 emails through 32 newsletters sent by Flow Sports to promote it. Seven, articles from 12 media publications dated 2016 and 23 that use of the mark as an identifier for USASF event. Eight, usage of the mark by the International Cheer Union to refer to the USAS event. Nine, growth of the event from 14 teams to 5,000. When you take that sort of, and I don't think that that's all that is in this record, drawing these matters and inferring what we would infer from this, couldn't a jury find secondary meaning from this? I don't think they would have to. You certainly put in evidence, including surveys, that would rebut it. But why wasn't this a jury question? And wasn't it error for the district court to take this away from the jury on summary judgment? Respectfully, Your Honor, we don't believe that the things you've listed would be enough to take this. Just help me with why. Well, for example, on advertising expenditures, most of that information, if not all of it, I don't want to overstep and say it's all, I think it's all of it, was from after the alleged infringement began in which the 11 circuits explain, again, that post-infringement evidence, that doesn't tell you about whether the market acquired distinctiveness back in 2020. So that's the timing issue. It goes back to the timing issue. So a lot of this usage by third parties, they're from 2022 or 23, and that doesn't tell you what a consumer's perception was back in 2020, or even within the months after the alleged infringement began. They refer to those flowchart reports, I'll try to talk about that, because that's one thing they cite several times. Well, the problem there, and with so many other pieces of evidence, is we don't have a single affidavit or testimony explaining what these are, the context in which they are in. And so for the flowchart reports, they talk about mostly 2022 and 21, but then they do have some numbers supposedly from the cheerleading and the dance world championships for 2017, 2018. So a big problem there is you don't have a way of distinguishing between what those numbers are for the dance world championship or the dance worlds, and you can't tell what's for the cheer worlds. And so that's a big problem with those flowchart reports, is you can't distinguish what those numbers are for what. And we don't have any declaration or testimony from anybody from flowchart or from the plaintiff putting those numbers into context, or how those would connect to what a relevant consumer perceived in the market. And so the problem with most, if not all, the evidence is that we're left where there's not a way for the court to make a reasonable inference from it. It's left trying to speculate and guess what some of these things might mean. And without explanations, explaining where these documents, where they fit in, or what was taking place, you're left just with conjecture at that point. All right. Thank you, Your Honor. Thank you very much. Thank you. Tell me about his argument that a fair amount of your evidence really doesn't give you much because it postdated the date of alleged infringement. Sure. So under the Gift of Learning case, also involved in athletic competition, the 11th Circuit looked at the date the competition was held as kind of that critical date. There is evidence they started promoting it July 30, 2020. The actual event, first event that they had was the first week of May 2021. And so if we're going to look at the date, anything prior to May 2021 is obviously relevant for secondary meaning. I also think, and there is substantial evidence from that, the flowchart data goes from 2017 forward. It distinguishes between the efforts for the dance worlds and the cheerleading worlds. The data is specific to the cheerleading worlds with millions of impressions, both under the marks worlds and the cheerleading worlds. There's also substantial email communications from industry participants, including defendants, that predate that May 2021 date, indicating that worlds is used as a source identifier for USASF's event. I also think the information and the evidence after May 2021 is relevant. And from that evidence, you can infer that there is secondary meaning. In particular, I think Your Honor gave an example of news articles. If they occur shortly after the event and they are using worlds and the cheerleading worlds specifically to refer to USASF's event, that gives you a window into how consumers and the industry perceived the mark at the time of the article, but also previously. The articles generally discuss the hype and enthusiasm regarding athletes competing at worlds, competing at this. So the dates the articles comprehend, they start in 16 and run through 23? Yes, yes. There's some before and there's some after. And I think when you consider them together, it's relevant. It's probative of the issue of secondary meaning as of the date the infringement began, even if the article is dated after. I also want to address the Daubert. Before you do, he made a couple of arguments about this litany of evidence that I referenced. One was the timing issue. You've addressed that. The second thing he said was the problem with this data is that there was no declaration, no affidavit, no effort to explain what it meant and why it bore on secondary meaning. And so the court was left to kind of draw inferences all by itself. And that was a risky proposition here. I think that is the essence of what he was saying. So were there any affidavits, declarations, explanations from anybody putting this in this body of evidence into context? So there is a declaration from Ali Stengel, who's the executive director of USASF, that discussed the marketing evidence. There is a declaration from the ICU, the International Cheer Union, regarding the industry's perception of the cheerleading world and the world's marks. There is also testimony, deposition testimony from USASF regarding the advertising efforts. I think when you're talking about the flow to your data specifically, it is not general USASF marketing data that this is generally how USASF promotes itself. It is specific to the event and the marks. And I think that's different than in some of the cases where courts have said, well, we just know about your general advertising expenditures. We don't know how it relates to this particular product or service and these marks. That's different. The flow to your data, the social media pages are specific to the event and specific to the marks. You said depositions. Whose depositions would be helpful on this? Can you marshal that for me? Sure. So Steve Peterson discussed the advertising efforts. I think Amy Clark's deposition also discussed the advertising efforts. Those depositions also discussed the lack of third party use of the mark worlds to refer to any other event. And I think Apelli's counsel may have misstated the single source doctrine. I think that's a key issue here. Consumers need to perceive the event as coming from a single source. Perceive the marks as coming from a single source. That doesn't mean one company. And it doesn't mean consumers have to be able to identify what that source is. It can be a unified group that is putting on the event and operating it as a single source. And a good analogy is the Iron Bowl. It's a rivalry football game by Auburn and Alabama. It's also registered on the principal register. It is consumers perceive this as a single event from a single source regardless of the fact that there's two organizations coming together to put the event on. And I think here USASF working alongside IASF in some ways to put on the event doesn't detract or undermine that the event and the marks are from a single source. All right. You've gone a little bit over your time. But thank you very much. Thank you. Thank you both.